IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
February 21, 2018 Session

# IN RE AVERY B.[1]

**Appeal from the Juvenile Court for Tipton County**
**No. 08-JV-10382     William A. Peeler, Judge**

_____

**No. W2016-02542-COA-R3-JV**

_____

This appeal arises from a modification of a permanent parenting plan established in 2010 in which Mother was designated as the primary residential parent. In December of 2012, Father filed a petition to modify the parenting plan alleging that Mother's mental health impeded her ability to properly care for their child. He also alleged that Mother alienated the child from Father due to numerous false allegations that Father abused the child, which resulted in temporary but substantial decreases in his parenting time. Although no evidence was produced indicating that Father abused the child, Mother continued to accuse Father of abuse and to take the child for repeated evaluations and physical exams. Following a three-day trial, the trial court designated Father as the primary residential parent, established a temporary parenting plan, and ordered Mother to attend counseling until the court was satisfied with her mental health so that it could issue a permanent parenting plan. Mother appealed that order; however, we dismissed the appeal for lack of subject matter jurisdiction because the order appealed from was not a final judgment. On remand, following an assessment of Mother's compliance with the court-ordered intensive therapy, the trial court entered a final judgment that included a permanent parenting plan from which Mother appeals. Mother contends the trial court erred in holding, *inter alia*, that there was a substantial and material change in circumstances requiring a modification of the parties' permanent parenting plan. She also contends the court erred in holding that it was in the child's best interest to change the primary residential parent to Father due, in part, to the fact the court failed to consider factors added to Tenn. Code Ann. § 36-6-106 pursuant to the 2014 amendment that became law on July 1, 2014. Finding no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

_____

[1] This Court has a policy of protecting the identity of children in dependent and neglect cases by initializing the last names of the parties.

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the court, in which J. STEVEN STAFFORD, P.J., W.S., and BRANDON O. GIBSON, J., joined.

Rachel L. Lambert, Arlington, Tennessee, for the appellant, Mary K. B.

Mitchell D. Moskovitz and Adam N. Cohen, Memphis, Tennessee, for the appellee, Charles C.

**OPINION**

Most of the relevant facts and procedural history of this case were previously identified in our opinion in the first appeal, *In re Avery B.*, No. W2014-01974-COA-R3-JV, 2015 WL 4055057, at *1-2 (Tenn. Ct. App. July 2, 2015), which read as follows:

> The parties in this case are unmarried parents to the minor child at issue, Avery B. ("Avery"). On December 22, 2008, approximately a month after Avery's birth, Mother filed a petition for child support and medical expenses in the Juvenile Court of Tipton County. Father responded on December 23, 2008, by filing a motion for genetic testing. Genetic testing later confirmed that Father was the biological parent of Avery, and initially, the parties were able to reach an agreement as to parenting issues. On March 26, 2010, the trial court approved an agreed permanent parenting plan that designated Mother as the primary residential parent. Father was awarded specified parenting time under the plan and was also ordered to pay $1,533.00 in monthly child support. Unfortunately, whatever peace was achieved through this parenting plan did not last.
>
> On December 18, 2012, Father filed a petition to modify the parties' parenting plan. His petition averred that Mother's mental capacity impeded her ability to properly care for Avery and also alleged that Mother had engaged in a pattern of behavior that alienated Avery from Father. In particular, Father claimed that Mother had made numerous false allegations that Father had sexually abused Avery. Father asserted that these allegations had resulted in a substantial decrease in his parenting time with Avery due, in part, to investigations of Father by the Department of Children's Services ("DCS") at the instigation of Mother. On January 8, 2013, Father filed a petition for criminal contempt against Mother. Father's contempt petition was predicated on Mother's alleged failure to honor Father's holiday parenting time.
>
> On March 28, 2013, the trial court entered a consent order adjudicating Father's petitions. Although the trial court did not alter its designation of Mother as Avery's primary residential parent, it did approve an agreed

parenting plan that afforded Father increased parenting time. Father's petition for criminal contempt was dismissed without prejudice. As before, the resolution of the litigation brought only temporary peace between the parties.

On December 16, 2013, Mother filed a pleading styled "Emergency Petition for Injunction and Petition to Modify the Previous Order of the Court to Suspend Father's Parenting Time and For Father to Receive Supervised Parenting Time." The petition alleged that Avery had made recent disclosures of sexual abuse committed by Father and expressed general concern for Avery's welfare. The petition requested that the trial court immediately suspend Father's parenting time or enter an order imposing conditions on his parenting time for Avery's care and protection. The petition also prayed that Father's parenting schedule be modified after a hearing, consistent with Avery's best interest.

Father responded to Mother's emergency petition on December 19, 2013. In his response, Father submitted that Mother had a history of making false allegations against him regarding his conduct towards Avery. He further stated that DCS had never found any evidence that Avery had been sexually abused. Contemporaneous with the filing of his response, Father filed his "Emergency Petition to Modify Parenting Plan, for Criminal Contempt, for Injunctive Relief, and for Supervised Parenting Time." The petition recounted Mother's alleged history of making false allegations against Father and averred that Mother's behavior reflected a pattern of mental instability. The petition stated that Mother should be required to seek long-term therapy and requested that her parenting time with Avery be supervised. Father contended that it was in Avery's best interest to designate him as the primary residential parent. Moreover, he alleged that Mother should be held in criminal contempt for willfully refusing to allow Father to exercise his parenting time.

A hearing on the emergency aspects to the parties' petitions was held on December 19, 2013. On January 21, 2014, the trial court entered an order finding that there was insufficient evidence to sustain Mother's emergency requests for relief. As a result, the trial court declined to suspend Father's parenting time or otherwise require that it be supervised. Other matters, however, were reserved for future adjudication.

A hearing on Father's petition to modify occurred over three separate dates in May and June 2014. The case was taken under advisement following trial. On September 4, 2014, the parties returned to court at which time the trial judge made an oral ruling that Father should be designated as the

primary residential parent for Avery. A written order memorializing this ruling was subsequently entered on September 9, 2014. In pertinent part, the trial court's order stated as follows:

2. A substantial and material change in circumstances exist such that it is in the best interest of the minor child, [Avery], to be in the care of Father, and Father shall be designated as the primary residential parent. The exchange of the minor child shall occur immediately.

3. Mother shall be awarded supervised parenting time. Counsel for the parties shall attempt to agree on an appropriate supervisor and schedule, but should they be unable, this Honorable Court shall determine the appropriate supervisor and schedule for Mother. It is the goal of this Court to award Mother standard parenting time after this Honorable Court is satisfied that Mother's long term therapy has appropriately addressed Mother's psychological functioning.

4. Mother shall immediately engage in intensive long term therapy to address those concerns of this Honorable Court regarding Mother's conduct and psychological functioning. The parties shall address this Court in ninety (90) days to assess Mother's compliance with this Court's requirement that Mother receive intensive therapy. Counsel for the parties shall contact the Clerk of Court to schedule said hearing.

5. Mother shall be enjoined from having anyone, including but not limited to, law enforcement, doctor, or therapist, evaluate the minor child without an Order of this Honorable Court.

6. Father shall select a therapist/counselor for Avery.

7. Father's ongoing child support obligation is terminated immediately. This Honorable Court shall address child support when Mother is able to exercise unsupervised parenting time.

On September 15, 2014, Mother filed a notice indicating that she was appealing the trial court's September 9 order. Nearly two months later, on November 4, 2014, the trial court entered an order setting a supervised

- 4 -

parenting schedule for Mother. The trial court's November 4 order stated that "[t]his schedule shall be reviewed in ninety (90) days from the Court's ruling on September 4, 2014, to assess Mother's compliance with this Court's order requiring Mother to receive intensive therapy and Counsel for the parties shall contact the Clerk of Court to schedule said hearing." Father's petition for contempt was later "denied" by an order entered on January 7, 2015.

In the first appeal, we determined that the order appealed from was not a final order; therefore, the appeal was dismissed for lack of subject matter jurisdiction. *Id*. at *4.

On remand, following an assessment of Mother's compliance with the court-ordered intensive therapy, the trial court entered an order, similar to the September 4, 2014 order, which scheduled another review in 90 days. Following several more review hearings, most of which focused on whether Mother had sufficiently complied with the requisite therapy, the trial court entered an order on November 8, 2016, that expanded Mother's parenting time. Believing the order constituted a final judgment, Mother filed another notice of appeal on December 8, 2016. Upon an initial review of the record, we determined that the November 8, 2016 order was not a final judgment; however, instead of dismissing the appeal, we entered an order that afforded the parties additional time to obtain a final judgment. On June 20, 2017, the trial court entered an Order Expanding Mother's Parenting Time, which we determined constituted a final appealable judgment. As a consequence, we allowed the appeal to proceed.

**ISSUES**

Mother presents three issues that we have rephrased to read as follows:

1. Whether the trial court erred in holding that there was a substantial and material change in circumstances requiring a modification of the parties' Permanent Parenting Plan.

2. Whether the trial court erred by failing to consider best interest factors added to Tenn. Code Ann. § 36-6-106 pursuant to the 2014 amendment that became law on July 1, 2014.

3. Whether the trial court erred in holding that it was in the child's best interest to change the designation of primary residential parent from Mother to Father.

For his part, Father asks that Mother be required to pay the attorney's fees and expenses he incurred in this appeal.

## ANALYSIS

### I. MATERIAL CHANGE IN CIRCUMSTANCES

Mother challenges the finding that Father proved a material change in circumstances on two grounds. She contends the most recent petition, filed in December of 2013, should have been dismissed because it is based on the same allegations as the previous petition that was filed in December of 2012, Mother filing reports that Father sexually abused Avery, which was resolved pursuant to the March 28, 2013 order. She also contends that none of the allegations made by Father affected Avery in any meaningful way and that the alleged "negative" or "meaningful" effect upon Avery amounted to pure speculation and conjecture.

Father responds by noting that the December 2013 petition identifies numerous events and acts by Mother that occurred subsequent to the disposition of the December 2012 petition; therefore, his petition is not barred by the doctrine of res judicata even though the allegations pertain to her repetitive reporting of unfounded claims of sexual abuse. Father also contends that the evidence preponderates in favor of the trial court's findings that the changes have affected Avery's well-being in a meaningful and harmful way.

In an action to change the primary residential parent, the party seeking the change must prove that a material change in circumstances has occurred and that it is in the best interest of the child to modify the current custody arrangement. Tenn. Code Ann. § 36-6-101(a)(2)(B); *Boyer v. Heimermann*, 238 S.W.3d 249, 259-60 (Tenn. Ct. App. 2007).

A petitioner seeking to change the primary residential parent is not required to show "a substantial risk of harm" to the child; however, the petitioner must prove a material change of circumstance by a preponderance of the evidence. Tenn. Code Ann. § 36-6-101(a)(2)(B). "A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child." *Id.*

If the court finds a material change in circumstances, the trial court must then determine whether a modification of the parenting plan is in the child's best interest. *Armbrister v. Armbrister*, 414 S.W.3d 685, 697-98 (Tenn. 2013).

Here, the trial court found Mother's actions in continuing to allege Father sexually abused Avery constituted a material change in circumstances. On June 14, 2010, the parties executed their first permanent parenting plan. Less than three months after this plan was executed, Mother took Avery, then nineteen months old, to the emergency room at LeBonheur Children's Hospital ("LeBonheur"). LeBonheur's records reveal that

Mother was concerned about whether Father was "touching" the child. The staff at LeBonheur found no evidence of sexual abuse and did not report this incident to DCS.

Mother did not make another allegation until April of 2012 when Mother took the child to DCS, alleging Father was being sexually inappropriate with the child. Mother subsequently took the child to LeBonheur for an exam but the child became physically violent and refused to allow the nurses to examine her. Based on Mother's allegations that Father was sexually inappropriate with the child, DCS filed a petition to adjudicate dependency and neglect on April 20, 2012, in the Juvenile Court of Shelby County.

Father was first made aware of any allegations of sexual abuse in May 2012 when the Child Advocacy Center contacted Father. DCS conducted an investigation based on Mother's allegations, and the Child Advocacy Center conducted a forensic exam of the child. During the investigation, Father's parenting time was supervised at the Exchange Club. While at the Exchange Club, Avery told Father, which statement was heard by a supervisor, that "Mommy told me you hurt me and you are very, very mean." Furthermore, at another visit, the Exchange Club records reflected that the "Child appeared to have and/or expressed inappropriate knowledge of the parental conflicts regarding referral issue for visitation. Avery commented [to Father] several times that 'Mommy said you are mean.'"

After concluding their investigation and reviewing a court-ordered mental and custodial evaluation of both parents and the child, prepared by Dr. Wyatt Nichols, DCS requested that the Juvenile Court of Shelby County dismiss the Petition. The Juvenile Court agreed and on November 14, 2012, dismissed the petition.

Father resumed unsupervised parenting time after the dismissal of the petition. According to Father, Mother interfered with Father's parenting time on multiple occasions which prompted Father to file a petition to modify the parenting plan. Father also filed a petition for contempt due to Mother's alleged continued interference. The parties proceeded to mediation in March 2013 and entered into a consent order and a new permanent parenting plan, which increased Father's parenting time. The order was entered on March 28, 2013.

Although Mother contends the allegations in the petition at issue in this appeal pertain to events that occurred prior to the entry of the March 28, 2013 order, therefore, they cannot constitute a material change of circumstances, we have determined that the trial court's findings pertain to incidents that occurred thereafter, as the following reveals.

On July 8, 2013, Mother took the child to Pediatrics East and made allegations that Father was abusing the child. The medical records reveal the following:

The symptoms [vaginal discomfort] began [two] days ago. The symptoms

are reported as being mild. Mother is concerned that father has been abusing [Avery], child denies inappropriate touching at her father's last week. [The child] had been at the beach with [Father] and his family, lots of swimming.

The pediatrician examined the child, found no signs of abuse, and elected to not report the allegations to DCS.

On July 10, 2013, two days after Mother took the child to Pediatrics East, the child had a counseling session at the University of Memphis Department of Psychology during which Mother reported to the counselor that when the child returned home from vacation with Father and Step-Mother, the child was "playing" with her genitals so Mother took her to the pediatrician. The records do not reflect that Mother informed the counselor that the child had denied any abuse at the pediatrician's office.

At a separate counseling session on August 21, 2013, Mother informed the counselor that Father was getting undressed in front of Avery and using the toilet in front of Avery. According to the counseling records, "no additional reporting was deemed necessary by the therapist or supervisor" because the child "did not report this to therapist." Mother was informed to discuss these actions with Father. However, Mother failed to do so.

In September 2013, Avery confided in Step-Mother that Mother told her to lie to "Ms. Rachel," who is Avery's counselor, Rachel Tillery, M.S. Father subsequently contacted Ms. Tillery to inquire about the counseling, and on October 1, 2013, Father and Step-Mother met with Ms. Tillery to discuss this matter and Avery's counseling.

Avery's last counseling session occurred on October 23, 2013. However, on November 26, 2013, Mother contacted Ms. Tillery again and alleged that Father was molesting Avery. Ms. Tillery did not report these allegations to DCS. The following day, November 27, 2013, Mother called the University of Memphis Department of Psychology and alleged Father was molesting Avery. Ms. Tillery was not available to speak with Mother but the supervising psychologist on hand, Dr. James Whelan, spoke with Mother. Because the allegations were made by Mother and not the child, Dr. Whelan did not contact DCS.

Five days later, on December 1, 2013, Mother took Avery to the emergency room at LeBonheur at approximately 9:00 p.m. Mother again reported Father was sexually abusing Avery. Avery was examined by the staff at LeBonheur and, again, there were no signs of abuse found. While at LeBonheur, two uniformed police officers from the Memphis Police Department Sex Crimes Unit arrived and questioned Avery regarding the alleged abuse. DCS was subsequently contacted and an investigation was initiated. Avery was then questioned by Ms. Vickie Watts, a case worker for DCS.

On December 13, 2013, Mother sought an *ex parte* suspension of Father's parenting time from the trial court, which refused her request. That same day, Mother took Avery to Pediatrics East alleging Father was touching Avery inappropriately. The child was again examined. The records reflect that the vaginal area was "normal." Mother then unilaterally withheld parenting time from Father on the weekend of December 13, 2013 through December 16, 2013, despite the request of Father's counsel to abide by the parenting plan.

On December 16, 2013, Mother filed an emergency petition for an injunction and to modify the parties' permanent parenting plan. In her petition, Mother alleged that Father was sexually abusing Avery and asked the trial court to suspend Father's parenting time.

After learning of these allegations, Father filed an Emergency Petition to Modify Parenting Plan, for Criminal Contempt, for Injunctive Relief, and for Supervised Parenting Time on December 19, 2013. On the same day, the trial court held a hearing on Mother's emergency petition. Ms. Watts, the DCS case worker, testified that Mother had informed her that Avery made allegations of sexual abuse against Father. Furthermore, Ms. Watts testified that when she met with Mother and Avery, Mother mainly discussed her issues with Father rather than the allegations of sexual abuse. Ms. Watts also testified that the previous case worker indicated that there were concerns with Mother's psychological evaluation, which was performed by Dr. Nichols, and that it had been recommended for Mother to receive ongoing counseling.

In Mother's emergency petition, she stated that Ms. Watts told Mother that she did not have to release Avery to Father for his parenting time. However, at the December 19th hearing, Ms. Watts testified to the contrary. Ms. Watts stated that she did not tell Mother that she did not have to release Avery to Father. On January 9, 2013, the trial court entered an order denying Mother's petition.

A bench trial was then held on Father's petition on three non-consecutive days in May and June 2014. At trial, the history mentioned above was revealed. The trial also included evidence of a recording in which Avery states, *inter alia*, that Mother "wanted me to tell that you're touching my privates, so I did tell [Ms. Rachel]." There was also expert testimony introduced at trial that the child was experiencing extreme tantrums during counseling and visits to the doctor and that these could be the result of Mother's insistence that the child is being abused. Furthermore, Mother's expert, Dr. Jolene Bailey, conducted psychological testing and an evaluation of Mother's parenting abilities which revealed Mother had an elevated score in the areas of hypochondriasis and hysteria.

Father's expert, Dr. John V. Ciocca, opined that these scores suggest that Mother will be overly preoccupied with the issue of physical illness and distress. Furthermore,

the hysteria elevation will likely serve to intensify Mother's reaction to potential physical claims made by the child. Dr. Ciocca also testified that these elevated scores tie into the number of times Mother has taken Avery to the doctor. Lastly, Dr. Ciocca testified that Mother's continuation in making false allegations is damaging to Avery's emotional well-being and her relationship with Father.

At the conclusion of proof, the trial court took the issue under advisement. On September 9, 2014, the trial court then issued its order finding that a material change in circumstances had occurred since the entry of the March 28, 2013 permanent parenting plan. Specifically, the court stated that since the entry of the prior plan,

> Mother has made at least seven additional documented allegations that Father has either abused or has been inappropriate with Avery. Mother has taken Avery to be physically examined on at least two occasions, and has subjected Avery to multiple evaluations and interviews by a variety of adults, including a uniformed police officer. In July 2013, Avery exhibited an extreme temper tantrum that lasted for one hour and twenty minutes, wherein she kicked, spat, and hit Mother, and also told Mother that she was a B**** and that she hated her. Avery has even informed Father that Mother told Avery to lie to the Department of Children's Services and tell them that Father touched Avery's privates. Avery told Father that Mother was mad at her because she did not tell the Department of Children's Services these lies. Avery is clearly experiencing serious distress as a result of Mother's behavior in repeatedly making these allegations and in communicating these beliefs to Avery.

In this appeal Mother contends that the petition at issue should have been dismissed because it is based on the same allegations as the previous petition that were resolved by the March 28, 2013 order, Mother is essentially arguing that Father was precluded from asserting, or re-asserting, her allegedly false allegations of sexual abuse because this same conduct was raised in the prior petition and was known to the parties and to the court when the current parenting plan went into effect. We disagree, having determined that Mother misapprehends the meaning of a material change of circumstances as it pertains to the facts of this case.

The facts and reasoning in *Staggs v. Staggs*, No. M2001-01192-COA-R3-CV, 2002 WL 31769112 (Tenn. Ct. App. Dec. 11, 2002) are instructive. In *Staggs* both parents were recovering alcoholics and this was known to the court and the parties when the prior parenting plan went into effect. *Id*. at *1. Following a relapse by the mother, the father prevailed on a petition to be named the primary residential parent. *Id* at *3. As the trial court explained following trial on the petition, there had been a material and substantial change of circumstances that "has been detrimental to the children, borderline devastating, and certainly would warrant consideration of a change of custody." *Id*.

- 10 -

The judge then considered the relevant factors found in Tenn. Code Ann. § 36-6-106 for determining which parent is better suited to exercise primary custody of the children. The court found that there was not much difference between the parties with regard to most of the factors enumerated in the statute, such as the "love, affection and emotional ties existing between the parents and the child," and "the disposition of the parents to provide the child with food, clothing, medical care, education. . . ." *Id*. (citing Tenn. Code Ann. § 36-6-106(1) and (2)). The trial judge also commended Ms. Staggs for admitting to her alcohol problem and attempting to deal with it but found that she had not completely conquered the emotional problems associated with it. However, the court found that Mr. Staggs had proven himself to be "mentally physically healthy and stable." *Id*. (citing Tenn. Code Ann. § 36-6-106(5)). Based on these and other findings, the trial court designated Mr. Staggs as the primary residential parent. *Id*.

On appeal, Ms. Staggs argued that since her alcohol issues were known at the time of the entry of the final decree, her drinking issues could not be considered unforeseeable. *Id*. *4. That is because this court previously held that "the change of circumstances relied upon by the petitioner should be one that could not have been foreseen at the time of the original custody decision." *Id*. This court, however, rejected the argument and held as follows:

> Regrettably, our prior pronouncements on foreseeability are a poor fit for a situation like the present one. It is now widely acknowledged by society that alcoholism is a disease that cannot be permanently cured, and that the recovering alcoholic is always in danger of succumbing to his or her addiction. In theory then, it is always foreseeable that an alcoholic will begin drinking again. We do not believe, however, that our recognition of this unfortunate fact should prevent us from considering a change of custody where a previously sober parent has fallen back into habits that are detrimental to the children in her care.

*Id*.

Father contends in his brief that the reasoning in *Staggs* applies to this matter, and we agree. Father was not precluded from bringing new allegations of false sexual abuse simply because Father raised similar allegations in the past. And, from our review of the December 2012 and December 2013 petitions, Father does raise new allegations against Mother. Therefore, Mother's argument fails.

We also find Mother's second argument unavailing. She contends that none of the allegations made by Father affected Avery in any meaningful way and that the alleged "negative" or "meaningful" effect upon Avery amounted to pure speculation and conjecture. Whether an accusation of child sexual abuse against a parent "affects the

- 11 -

child in a meaningful way" was at issue in *Keisling v. Keisling*, 196 S.W.3d 703, 718 (Tenn. Ct. App. 2005) (*perm. app. denied* May 30, 2006).

> Accusations of child sexual abuse by one parent against the other parent presents one of the most difficult issues faced by a trial court. Suspicion of such abuse must be taken seriously and were investigated thoroughly, for the consequences to the child of allowing any abuse to continue are grave. However, *mistakenly concluding that a parent has abused his child, when in fact there has been no abuse, has serious consequences as well, including the almost-certain destruction of the parent-child relationship* and disgrace to the accused parent. In addition, determining whether abuse has occurred can be enormously difficult; there is frequently a paucity of physical evidence, and the alleged child victim may be unable to accurately relate pertinent events. Finally, *even investigating the accusation is delicate; the suggestibility of the alleged victim is almost invariably an issue, and heavy-handed or repetitive interrogation or physical examination can itself inflict long-lasting trauma on a child.*

> .   .   .

> In a case such as this, any concern about reporting allegations of child sexual abuse must be balanced with the awareness that false accusations of such abuse can be a "reprehensible tool" against an ex-spouse, remarkable for its "brutal effectiveness."

*Id.* at 722 (emphasis added).

With the foregoing in mind and after a thorough review of the entire record, we have determined that the record fully supports the trial court's finding that Avery experienced serious distress as a result of Mother's behavior in repeatedly making these allegations and in communicating these beliefs to Avery. Furthermore, Mother coerced the child into lying about these allegations of sexual abuse, which also caused significant negative effects to Avery. Moreover, and significantly, Mother subjected Avery to numerous invasive physical exams by healthcare professionals as well as questions and evaluations by physicians, DCS workers, and police officers. Yet, after all of these examinations, evaluations, and investigations, there is no evidence of sexual abuse by Father.

Based on the foregoing, we affirm the trial court's determination that Father has proven a material change of circumstance. Therefore, we turn our focus to whether a modification of the parenting plan is in the best interest of the child. *See Armbrister*, 414 S.W.3d at 697.

- 12 -

ENNESSEE CODE ANNOTATED § 36-6-106 (2014)

Mother contends the trial court failed to consider new and additional best interest factors under Tenn. Code Ann. § 36-6-106 that went into effect on July 1, 2014. Father contends the trial court applied the correct version of the statute because the court applied the version that was in effect when the case was tried. Father also contends this issue has been waived because Mother never raised the issue in the trial court. We agree with Father on both points.

The amendment to Tenn. Code Ann. § 36-6-106 at issue here went into effect on July 1, 2014.[2] *See* 2014 Pub. Acts, c. 617, § 4, eff. July 1, 2014. The case was tried over three days, on May 19, 2014, May 29, 2014 and June 26, 2014. Thus, when the trial concluded, the 2014 amendment had not yet gone into effect. Although the trial court's ruling was not announced until after the amendment went into effect, we have determined that the trial court did not err in applying the pre-amendment factors, that being those stated in Tenn. Code Ann. § 36-6-106 (2013).[3] *See Roland v. Roland*, No. M2014-02032-COA-R3-CV, 2015 WL 5719833, at *5 (Tenn. Ct. App. Sept. 29, 2015) (applying the statute that was in effect at the time of the proceedings and not when the order was entered); *see also Mackey v. Mayfield*, No. E2014-02052-COA-R3-CV, 2015 WL 5882657, at *3-4, *7-8 (Tenn. Ct. App. Oct. 8, 2015) (applying the previous statute when trial was held on June 25-27, 2014, the statute took effect on July 1, 2014, and the order was entered on July 25, 2014). Therefore, the court acted correctly by applying the relevant statutory best interest factors in effect when the case was tried.

We have also determined that at no time during the trial, or prior to the trial court's oral ruling on September 4, 2014, or the entry of the final judgment, did Mother ask the trial court to apply the new best interest factors enacted by the 2014 amendment. At the conclusion of the trial on June 26, 2014, the court asked the parties to submit proposed findings of fact and conclusions of law, which they did. By the time the parties

---

[2] The legislative history reveals that the 2014 amendment was enacted to address several circumstances including the fact that the legislature determined that "subsections 36–6–106(a), 36–6–404(b), and 36–6–108(c) and (e) of the Tennessee Code Annotated establish different factors pertaining to judicial review of custodial arrangements and the establishment of residential schedules for minor children"; "the factors listed in each section differ slightly in their specifics, causing confusion and inconsistent application of the law"; "the factors that determine custodial arrangements or establish a residential schedule for minor children should be consistent"; "the wording of Tennessee Code Annotated, subdivision 36–4–106(d)(5) concerning relocation of a parent also causes confusion and inconsistent application of the law"; and the wording of "subdivision 36–6–101(a)(3)(A) concerning the rights of parents also causes confusion and inconsistent application of the law." TN LEGIS 617 (2014), 2014 Tennessee Laws Pub. Ch. 617 (S.B. 1488).

[3] Our reference to Tenn. Code Ann. § 36-6-106 (2013) refers to the statute as it read prior to the July 1, 2014 amendment going into effect. *See* 2013 Pub. Acts, c. 385, § 1, eff. May 14, 2013.

returned to court to receive the trial court's oral ruling, which was on September 4, 2014, the 2014 amendment had gone into effect; nevertheless, Mother did not ask the trial court to apply the new best interest factors enacted by the 2014 amendment.[4] Moreover, at no point in the trial court proceedings did Mother argue that the trial court applied the wrong version of the statute. In fact, it was first raised in her brief in this appeal.

"The law in Tennessee is well settled that issues not raised in the trial court may not be raised on appeal." *Blankenship v. Anesthesiology Consultants Exch., P.C.*, 446 S.W.3d 757, 760 (Tenn. Ct. App. 2014) (citing *In re: The Guardianship of R.D.M.*, 306 S.W.3d 731, 736 (Tenn. Ct. App. 2009)); *Hill v. Moncier*, 122 S.W.3d 787, 792 (Tenn. Ct. App. 2003), on reh'g (July 11, 2003) (quoting *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn.Ct.App.1996) ("It is well-settled that issues not raised at trial may not be raised for the first time on appeal.")). Therefore, this issue has been waived.

## II. BEST INTEREST FACTORS

Mother argues that the trial court erred in finding that it was in the best interest of Avery to name Father the primary residential parent. Mother claims that she is comparatively more fit to serve as the primary residential parent.

Tenn. Code Ann. § 36-6-106(a) (2013) provides that "in any other proceeding requiring the court to make a custody determination regarding a minor child, the determination shall be made on the basis of the best interest of the child." The court is to consider the child's best interest and "shall order a custody arrangement that permits both parents to enjoy the maximum participation possible in the life of the child consistent with the factors set forth in Tenn. Code Ann. § 36-6-106(a)(1)-(10)." Tenn. Code Ann. §36-6-106(a) (2013). In coming to a determination of what is in the child's best interest, the court must consider all relevant factors, including, where applicable, the following:

(1) The love, affection and emotional ties existing between the parents or caregivers and the child;

(2) The disposition of the parents or caregivers to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent or caregiver has been the primary caregiver;

(3) The importance of continuity in the child's life and the length of time

---

[4] We acknowledge that Mother's memorandum in support of her post trial proposed findings of fact and conclusions of law, which was filed on July 18, 2014, cited Senate Bill No. 1488 and that she attached a copy of the bill as an exhibit; however, at no point did Mother inform the trial court that it should apply the new best interest factors in making its decision.

the child has lived in a stable, satisfactory environment; provided, that, where there is a finding, under subdivision (a)(8), of child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a nonperpetrating parent or caregiver has relocated in order to flee the perpetrating parent, that the relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents or caregivers;

(5) The mental and physical health of the parents or caregivers. The court may, when it deems appropriate, order an examination of a party pursuant to Rule 35 of the Tennessee Rules of Civil Procedure and, if necessary for the conduct of the proceedings, order the disclosure of confidential mental health information of a party pursuant to § 33-3-105(3). The court order required by § 33-3-105(3) shall contain a qualified protective order that, at a minimum, expressly limits the dissemination of confidential protected mental health information for the purpose of the litigation pending before the court and provides for the return or destruction of the confidential protected mental health information at the conclusion of the proceedings;

(6) The home, school and community record of the child;

(7)     (A) The reasonable preference of the child, if twelve (12) years of age or older;

(B) The court may hear the preference of a younger child on request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent or caregiver and the person's interactions with the child; and

- 15 -

(10) Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

Tenn. Code Ann. § 36-6-106(a)(1)-(10) (2013).

Determining a child's best interest is a fact-sensitive inquiry, and, depending upon the significance of certain facts, a single factor can control the outcome of this determination. As we have explained:

Ascertaining a child's best interests does not call for a rote examination of each of [the relevant] factors and then a determination of whether the sum of the factors tips in favor of or against the parent. The relevancy and weight to be given each factor depends on the unique facts of each case. Thus, depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis.

*In re Marr*, 194 S.W.3d 490, 499 (Tenn. Ct. App. 2005).

If the issue was contested and the court changes the primary residential parent, "the court shall make such a finding as to the reason and the facts that constitute the basis for the custody determination." Tenn. Code Ann. § 36-6-101(a)(2)(B)(ii).

The determination of where the best interests of the child lie is a factual question. *In re T.C.D.*, 261 S.W.3d 734, 742 (Tenn. Ct. App. 2007). On appeal, we presume that the trial court's findings on this matter are correct unless the evidence preponderates against them. *Armbrister*, 414 S.W.3d at 693 (Tenn. 2013); *see* Tenn. R. App. P. 13(d). In order for evidence to preponderate against a finding of the trial court, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000)).

- 16 -

In this case, the trial court first considered Tenn. Code Ann. § 36-6-106(a)(1) (2013), which states "[t]he love, affection and emotional ties existing between the parents or caregivers and the child." The trial court found that it is undisputed that Avery loves both Mother and Father, and both parents love Avery. From our review of the record, the evidence at trial supports this finding.

Next, the court considered Tenn. Code Ann. § 36-6-106(a)(2) (2013) which states, "[t]he disposition of the parents or caregivers to provide the child with food, clothing, medical care, education, and other necessary care and the degree to which a parent or caregiver has been the primary caregiver." Although the trial court did not expressly state that this factor weighed in favor of Father, it is apparent from the language used in the trial court's order that it does weigh in favor of Father. The trial court was concerned with the frequency in which Mother took the child to receive medical care and the frequency in which the child was physically examined. Furthermore, the trial court found that the recurring physical examinations had a very negative impact on the child's well-being. We agree with this finding.

Though the court does not want to chill a parent reporting possible sexual abuse, since the court entered the March 28, 2013 permanent parenting plan, Mother has taken the child to the pediatrician twice alleging abuse; she has alleged abuse multiple times during the child's therapy sessions; and she has taken the child to LeBonheur's emergency department at 9:00 in the evening. These healthcare providers found no evidence of abuse. Furthermore, due to Mother's allegations at LeBonheur, police interviewed the child and involved DCS for the second time in this child's short life. However, that investigation, like the first investigation, did not produce evidence of sexual abuse. Lastly, there was evidence produced at trial that the child is experiencing extreme distress due to Mother's behaviors. (e.g., Avery's extreme tantrums and confusion over whether she was in trouble because she did not lie about Father to her therapist). Therefore, this factor weighs in favor of Father.

The third factor pertains to the importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment. *See* Tenn. Code Ann. § 36-6-106(a)(3) (2013). The trial court found that this factor weighed in favor of Father. The trial court stated that although the child "has resided with Mother for the majority of her young life . . . the Court does not find that [the child] has lived in a stable, satisfactory environment with Mother." The trial court then gave a brief overview of the child's medical history due to Mother's allegations and concluded that "the exposure to such a variety of unfamiliar adults" did not provide a "stable or satisfactory environment for a five year old child." We agree with this finding because the child has not lived in a stable, satisfactory environment due, mainly, to Mother's continual need to express allegations of sexual abuse by Father against the child. Therefore, we agree that this factor weighs in favor of Father.

The fourth factor addresses "[t]he stability of the family unit of the parents or caregivers." Tenn. Code Ann. § 36-6-106(a)(4) (2013). The trial court found that this factor weighed in favor of Father because Father and Step-Mother have resided in their home for several years. On the other hand, Mother lives alone, and she has an unstable relationship with her sister. Mother lives close to her parents, and Avery often interacts with Mother's parents. However, when Mother's mother was asked whether she knew that no evidence had been produced against Father, she replied, "To date." She further explained that she believes the investigation needs to continue despite all evidence to the contrary. Having reviewed the evidence, we are unable to conclude that it preponderates against the trial court's finding that this factor favors Father.

The fifth factor concerns the mental and physical health of the parents or caregivers. *See* Tenn. Code Ann. § 36-6-106(a)(5) (2013). The trial court found that this factor weighed in favor of Father and the record fully supports this finding. Expert testimony introduced at trial proves that Mother has significant mental health issues and that it is important she continue the court-ordered therapy. Further, concerns regarding Mother's mental stability are supported by her actions and other evidence in the record. Moreover, Mother has several health issues that include fibromyalgia, kidney failure, blood pressure issues, degenerative disc disease, and a ruptured disc in her back. Accordingly, we agree that this factor favors Father.

The sixth factor concerns the home, school, and community record of the child. *See* Tenn. Code Ann. § 36-6-106(a)(6) (2013). The trial court found that this factor did not favor either parent, and we agree with this finding.

The seventh factor pertains to the preference of the child, if the child is 12 years of age or older. *See* Tenn. Code Ann. § 36-6-106(a)(7) (2013). Because the child was less than 12 years old, the trial court correctly determined that this factor was not relevant.

The eighth factor, which pertains to evidence of physical or emotional abuse to the child, reads as follows:

> Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that, where there are allegations that one (1) parent has committed child abuse, as defined in § 39-15-401 or § 39-15-402, or child sexual abuse, as defined in § 37-1-602, against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected to the evidence. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

- 18 -

Tenn. Code Ann. § 36-6-106(a)(8) (2013).

The trial court found this factor weighed in favor of Father, and the record supports this finding. Mother has made numerous allegations of sexual abuse, which have been examined by numerous health care providers and investigated by DCS, and none of which have been substantiated. Furthermore, based on evidence that Mother instructed the child to lie in regard to Father's alleged abuse, the trial court found that

coercing a child into making such horrible accusations is psychologically damaging to the emotional well-being of the child, and that this behavior constitutes emotional abuse. If the Court allows the child to remain in Mother's care the Court believes that Mother will continue to make these allegations and attempt to coerce the child into believing them.

Having examined the evidence in the record, we agree with the trial court's finding.

The ninth factor pertains to "[t]he character and behavior of any other person who resides in or frequents the home or a parent of caregiver and the person's interactions with the child[.]" Tenn. Code Ann. § 36-6-106(a)(9) (2013). Although the trial court did not expressly state that this factor weighed in favor of Father, it is implicit from the trial court's order that this factor favors Father. This is evident from the trial court's finding that "Step-Mother and Avery have a very close and loving relationship" and, conversely, the trial court stated that it "has concerns . . . about Mother's character and behavior. . . ." Moreover, the court expressly noted that "when Mother's mother, . . . was asked if there had ever been any evidence of Father abusing Avery, [she] answered 'Not yet', indicating that she and Mother's family would continue to make allegations that Father has sexually abused Avery." The evidence preponderates in favor of the finding that this factor favors Father; therefore, we find that this factor favors Father.

The last factor, Tenn. Code Ann. § 36-6-106(a)(10) (2013), states the following:

Each parent's or caregiver's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, consistent with the best interest of the child. In determining the willingness of each of the parents and caregivers to facilitate and encourage a close and continuing parent-child relationship between the child and both of the child's parents, the court shall consider the likelihood of each parent and caregiver to honor and facilitate court ordered parenting arrangements and rights, and the court shall further consider any history of either parent or any caregiver denying parenting time to either parent in violation of a court order.

- 19 -

The trial court found that this factor weighed in favor of Father:

> The Court heard an abundance of testimony regarding the hostile relationship between the parties. The Court finds that Mother's past behavior indicates that she will continue making allegations that Father has been inappropriate with the child, which could ultimately damage the relationship between Father and Avery. The Court finds that Mother has a history of disregarding court orders regarding parenting time, and has consistently withheld parenting time from Father. As a result, Father has been forced to file three petitions in the past eighteen (18) months to enforce the parenting schedule. The Court did not hear any testimony that Father has not complied with the orders of the Court. This Court finds that Father is the parent that is most likely to abide by the Court's orders and honor court ordered parenting arrangements and rights.

Although there is evidence to support the trial court's conclusion that Mother disobeyed court orders in regard to parenting time, there was also evidence that Father refused to talk to Mother. However, Father's refusal to communicate with Mother is mitigated by the severity of her accusations of assault against Father and his distrust of what she may say about him or what he might say to her. Nevertheless, the evidence does not preponderate against the trial court's finding that Father is more likely to abide by the court's orders and honor court-ordered parenting arrangements and rights in the future. Accordingly, the evidence does not preponderate against the finding that this factor favors Father.

Upon consideration of the above best interest findings and the relevancy and weight to be given to each factor based on the unique facts of this case, and realizing that ascertaining a child's best interests does not call for a rote examination of each of the relevant factors and then a determination of whether the sum of the factors tips in favor of or against the parent as *In re Marr* instructs, *see id.*, 194 S.W.3d at 499, we find that the evidence overwhelmingly weighs in favor of Father. Therefore, we affirm the trial court's determination that it is in the best interest of Avery to change custody from Mother to Father.

### III. ATTORNEY'S FEES ON APPEAL

Father submits that Mother should be required to pay Father's attorney's fees on two alternative grounds. One is based on the contention that Mother "again" failed to procure a final order before appealing. The other ground reads "To the extent [the court] considers the merits of Mother's appeal Father respectfully submits that Mother should still be ordered to pay Father's attorney fees and suit expenses." The authority on which Father relies in this respect is Tenn. Code Ann. § 36-5-103(c), which states that a person

to whom the custody of the child is awarded may recover reasonable attorney's fees incurred in regard to an action concerning the adjudication of the custody or the change of custody of any child.

We have determined that the order from which this appeal lies was a final judgment, although belated; nevertheless, this appeal is from a final judgment. Therefore, the first ground on which Father relies cannot form a basis for an award of fees and expenses.

As for the alternative ground, whether to award attorney's fees on appeal is within this court's sole discretion. *Wills v. City of Memphis*, 457 S.W.3d 30, 51 (Tenn. Ct. App. 2014) (citing *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). When considering a request for attorney's fees under Tenn. Code Ann. § 36-5-103(c), we will consider "the requesting party's ability to pay, the requesting party's success on appeal, whether the appeal was taken in good faith, and any other relevant equitable factors." *Culbertson v. Culbertson*, 455 S.W.3d 107, 158 (Tenn. Ct. App. 2014) (citing *Moran v. Willensky*, 339 S.W.3d 651, 666 (Tenn. Ct. App. 2010)). After considering these factors, we exercise our discretion by denying Father's request to recover his fees and expenses on appeal and hold that the parties shall be responsible for their respective fees and expenses.

## IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Mother.

_____
FRANK G. CLEMENT JR., P.J., M.S.